IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NEVIN CAPLE                          :          CIVIL ACTION
                                     :
         v.                          :
                                     :
DAIICHI SANKYO U.S. PHARMA,          :
INC., et al.                         :          NO. 10-1271

MEMORANDUM

Dalzell, J.                                     December 20, 2011

          Nevin Caple ("Caple") brings this suit against her

employer, Daiichi Sankyo U.S. Pharma, Inc. ("DSI"),[1] alleging

breach of contract, violation of the Pennsylvania Wage Payment

and Collection Law ("WPCL"), and employment discrimination under

42 U.S.C. § 1981.  Caple's remaining claims arise out of DSI's

alleged failure to re-calculate her incentive compensation and

rankings in connection with a data anomaly.[2]

          DSI has filed a motion for summary judgment, to which

Caple has responded and as to which DSI has filed a reply.  For

_____

          [1] The caption implies multiple named defendants.  In
addition to DSI, Caple names John Doe and Rita Roe.  Since the
parties never address claims against either of these stand-in
defendants, we will treat DSI as the sole defendant.

          [2] Caple withdrew her breach of contract, WPCL, and §
1981 claims arising from DSI's alleged failure to credit her for
sales of Effient she should have received from prescriptions
written by residents and fellows at Einstein Hospital.  Pl.'s
Resp. Opp. M. Summ. J. 2 n.1.

the reasons set forth below, we will grant DSI's motion for summary judgment.

## I.   **Factual Background**

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record." Bello v. Romeo, 424 F. App'x 130, 133 (3d Cir. 2011).

We will thus begin by reciting the undisputed facts in this matter.  In so doing, we will keep in mind that "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment," Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009), and that we should not credit statements in affidavits that "amount[] to (I) legal argument, (ii) subjective views without any factual foundation, or (iii) unsupported assertions made in the absence of personal knowledge." Reynolds v. Dep't of Army, 2011 WL 2938101, at *2 (3d Cir. 2011).

2

The parties agree on most details of Caple's employment history with DSI.  In the one place where it will be relevant, we will note a factual dispute that the parties have each supported with specific citations to the record.

Nevin Caple is a black female.  Pl.'s Compl. ¶ 2. Since July of 2008, DSI employed her as a Cardiovascular Specialty Representative ("CVS Representative" or "rep") assigned to sell pharmaceuticals to a specified group of cardiologists in North Philadelphia.[3]  Glasgow Decl. ¶ 4.i; Pl.'s Dep. 25:22-27:6, 34:15-35:24, 50:15-18, 52:5-53:13; Koniaris Decl. ¶ 12.  In addition to salary, Caple was eligible to earn incentive compensation under DSI's CVS Representatives Sales Incentive Bonus Plans ("Bonus Plans").  The Bonus Plans provided for quarterly incentive payments and membership in programs for reps with high performance.  Id. 27; Koniaris Decl. ¶¶ 34-40; Exs. C-3 through C-9 at 3,5,7, Exs. C-3 through C-9 at 7.

IMS Health ("IMS") is a major, third-party company that collects data relating to the sales of pharmaceutical products and sells it to that industry.  DSI uses IMS's data to calculate the incentives awarded under its Bonus Plans.  Koniaris Decl. ¶¶

---

[3] Though not explicitly stated in the record, it appears that Caple still works for DSI.

3-5.  IMS employs a projection data gathering methodology that does not account for each and every prescription written for a particular drug.  This method results in a certain acknowledged degree of imprecision in IMS's data.  Id. ¶¶ 7,8.

DSI's Bonus Plans specify that all incentive compensation calculations will be performed using monthly IMS Xponent data ("IMS data").  Exs. C-3 through C-9 at 5.  Thus, physicians write prescriptions, these data get reported to IMS, and IMS processes the data into a form that it supplies to interested parties in the industry.  Koniaris Dep. 10:4-16.  IMS periodically provides DSI with data regarding sales of DSI products (such as the high blood pressure medication Azor) and competitors' products (like Exforge) to enable DSI to calculate its market share.  Market share factors prominently into DSI's incentive compensation calculations.  Koniaris Dep. 10-13.

Arpound July 1, 2008, Caple became a CVS Representative.[4]  She became responsible for selling two pharmaceuticals -- in particular, Benicar and Azor.  Glasgow Decl. ¶ 4.i; Pl.'s Dep. 50:15-18; Pl's Compl. ¶ 8.  Much of her

---

[4] DSI also has Primary Care sales representatives and Hospital sales representatives, and these employees target primary care physicians and hospitals, respectively.  Koniaris Decl. ¶ 12.

incentive compensation plan was determined by Azor sales. Koniaris Decl. Exs. C-3, C-5 at 4.

Caple worked under Dan Pagana ("Pagana"), Senior District Manager, Cardiovascular Specialty Sales-Philadelphia. Pl.'s Dep. 29:8-10; Duncan Dep. 6:2-6.  Some time in the second half of 2008, Caple and Pagana each noticed a larger-than-expected number of competing Exforge prescriptions in an "All Other Third Party" payer category in DSI's Azor Philadelphia market share reports ("data anomaly").  These reports included sales representative data from Caple's North Philadelphia territory and the Central Philadelphia territory.  Pl.'s Dep. 81:13-24; Pagana Dep. 9-12.  These DSI reports were created based upon IMS-provided data.  Koniaris Decl. ¶ 14.  Pagana and Caple's incentive compensation both hinged, in part, on these data and DSI's use of it.  Pagana Dep. 49-50; Pl.'s Dep. 32:24-34:3.

Pagana spoke with Lee Smith ("Smith"), the Regional Sales Director, and others about the data anomaly.  Smith took a lead role in reviewing the issue because he was a supervisor of Primary Care sales representatives in the North Philadelphia territory, one of the regions the anomaly affected.  Smith Dep. 6:1-3, 8:21-9:24.  Smith then contacted Patrick Keenan, Senior Manager, Regional Market Planning, to assist with the review of

the data.  Kennan Dep. 10:19-22.  Keenan, in turn, contacted IMS

and requested that it investigate the data anomaly.

On August 27, 2009, IMS notified Keenan by email that

it believed the Exforge data were in fact "sound since the

prescriber data [wa]s at acceptable levels."  Keenan Decl. Ex. 1.

Despite IMS's response, on September 4, 2009 Keenan asked for a

further investigation and forwarded additional information to

IMS.  Id.  He sent a list of twenty doctors identified as having

the highest volume of Exforge prescriptions in the "All Other

Third Party" payer category.  This data set captured the top

three prescribing doctors' data that factored into Azor

compensation calculations for Caple and other DSI employees,

which included five Caucasians and one black man.  Pl.'s Dep. 92-

93; Glasgow Decl. 4.a-4.f.  Keenan also notified IMS of a rumor

that an Exforge sales representative may have had some improper

dealings with one particular pharmacy.  Pagana Dep. 23:23-24:6.

On September 22, 2009, IMS submitted a two-page report

documenting its investigation's findings ("IMS Report").  Id. Ex.

2.  IMS concluded that although the reported Exforge sales volume

makes the data "suspect[,] IMS accepted the data into the

database because the data passed all IMS quality control edits,

therefore no further action can be taken by IMS and no changes

6

will be applied to the IMS database."  Keenan Decl. Ex. 2 (IMS Report).

Smith then asked Peter Koniaris, DSI's Director of Sales and Incentives, to look into what, if any, effect the data anomaly might have on DSI's employees' incentive compensation. Smith Dep. 20-21; Koniaris Dep. 5:15-17, 19-20, 24:6-12. Koniaris testified that as part of his task he was asked if a re-run would affect white employee C.M.'s[5] compensation.  Koniaris Dep. 27:19-7.  He was not asked how Caple's compensation would be affected.  Koniaris Dep. 27:24-28:8.  Koniaris conducted a "hypothetical analytic," Koniaris Dep. 25:11, in which he re-ran Azor bonuses for underline sales representatives generally (a group that does not include CVS reps) by extracting all of the Exforge prescription data for the North and Central Philadelphia territories over the six month period from January through June of 2009.  Koniaris Dep. 26:12-15.  Koniaris was never asked to do a similar hypothetical analyses for other territories or for employee classifications besides the Primary Care sales reps. Thus, the incentive compensation of the CVS Representative cohort that included Caple was not recalculated and DSI reached no

---

[5] C.M. is a non-party to this litigation and use of his full name adds nothing to our analysis.

"determination or assumption one way or the other[] with respect to how this Exforge data would . . . affect[] Ms. Caple." Id. 32:9-17.

In an October 6, 2009 email, Koniaris informed Smith that:

> I re[-]ran their AZOR bonus only, and found that [the North Philadelphia territory], where [C.M.] resides, is due $26. [The Central Philadelphia territory] performance was moved minimally by the reduction in Exforge volume and thus did not earn any additional [incentive compensation].

Koniaris Decl. Ex. 1. Though Koniaris recommended that DSI pay C.M. this amount, it chose not to follow this recommendation. Id. ¶ 25. In fact, DSI did not re-run incentive compensation for, or pay additional money to, any employee in connection with the data anomaly.[6] Id. ¶ 24.

When Koniaris performed his hypothetical analysis, he "did not know the races of the sales representatives in the

---

[6] In late 2007 and February of 2008, DSI re-ran incentive compensation calculations because of unrelated statistical problems. In one case, IMS corrected misstated data. In the other, a third-party company incorrectly included data in an incentive compensation report. Koniaris Decl. ¶¶ 26-28. Because of these changes in the underlying data, DSI re-ran its compensation and rankings in those instances. In the episode at issue here, the underlying data never changed.

Central and North Philadelphia . . . territories, nor did [he]

know Nevin Caple's race." <u>Id.</u> ¶ 17.  He was not familiar with

Caple prior to the initiation of this litigation.  Koniaris Dep.

32:6-8.

     In light of Koniaris's analysis, he decided that DSI

would "not re[-]run[] [Incentive Compensation] Statements or any

ranking reports due to this [Exforge data anomaly] as it [does]

not provide a cost benefit to the company."  Koniaris Decl. Ex.

1.  In his deposition, Koniaris explained the basis for his cost-

benefit reasoning:

> Not only would we [have to re-run
> incentive compensation statements]
> for those particular
> representatives of those particular
> territories [used in our
> hypothetical analyses], because we
> run a relative rank system within
> the company, if there's any change
> in rank, one above or two below or
> whatever the ultimate rank change
> would be, <u>you would have to do that
> with the entire company and re-run
> the entire company's incentive
> compensation bonus</u>.  Knowing full
> well, in order to represent that
> small change for one or two
> territories, <u>the vast majority of
> the folks wouldn't change</u>, but it
> would have to be re-run in order to
> make sure it's captured in the
> incentive compensation statements.

Koniaris Dep. 29:18-30:5 (emphasis added).  Koniaris estimated it
would cost between five to ten thousand dollars to re-run the
entire compensation and ranking system.  Id. 28:24-29:5.
Koniaris also explained that his decision was motivated by "IMS
ha[ving] determined that the data had passed all of its quality
controls and that it would not be changing the data."  Koniaris
Decl. ¶ 23.  Thus, DSI decided to use the IMS data as called for
in the Bonus Plans.  Id. C-3 through C-9 at 5.

        DSI contends that neither it nor IMS ever determined
whether the "All Other Third Party" Exforge prescription data was
incorrect.  Pagana Dep. 16:8-11; Duncan Dep. 15:1-8, 17:1-16;
Keenan Decl. Ex. 2 (IMS Report).  Caple, on the other hand,
contends that "Smith, who led the investigation into the Exforge
Data Anomaly, confirmed that IMS determined that the data was
false or fake[.]"  Pl.'s Resp. Opp. M. Summ. J. 8 (referencing
Smith Dep. 14:22-24 ("the prescriptions that were there, were,
you know, termed by IMS to be flawed or fake or whatever you want
to call it.).  A few moments later, Smith testified in his
deposition that calling the data "flaw[ed] or fake . . . was
probably just my terminology.  But I never remember hearing . . .
that IMS said that [the data] were fake").  Smith Dep. 19:13-15.

DSI references deposition testimony in which Caple alleged that DSI employees directed racial comments at her in addition to citing other alleged examples of DSI's discriminatory actions.  Caple alleged that in January of 2010 she overheard a manager say "'and give her a one-way ticket to Haiti'" because she had inquired into DSI's alleged failure to credit her for certain other drug sales no longer relevant here.  Pl.'s Dep. 148:2-149:1-18.  Caple also claimed that in early 2010 Pagana called her hair "bushy," id. 165:10-11, and that he told her in June of 2010 that she was hired "'to meet quota.'"  Id. 161:11, 163:14-15.  Because of DSI's heavily white managerial environment, she labeled it a "white bread company."  In addition, she alleged that DSI received applications from, but did not hire, an unspecified quanta or quantum of minority candidates.  Id. 283:17-24, 286:18-287:12.

## II.  **Analysis**

On a motion for summary judgment, "[t]he moving party first must show that no genuine issue of material fact exists," Adderly v. Ferrier, 419 F. App'x 135, 136 (3d Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)), whereupon "[t]he burden then shifts to the non-moving party to set forth

specific facts demonstrating a genuine issue for trial." Id.
"'A disputed fact is "material" if it would affect the outcome of
the suit as determined by the substantive law,'" J.S. ex rel.
Snyder v. Blue Mountain Sch. Dist., 2011 WL 2305973, at *6 (3d
Cir. 2011) (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070,
1078 (3d Cir. 1992)).  A factual dispute is genuine "'if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party. . . . The mere existence of a scintilla
of evidence in support of the plaintiff's position will be
insufficient; there must be [significantly probative] evidence on
which the jury could reasonably find for the plaintiff." Bialko
v. Quaker Oats Co., 434 F. App'x 139, 141, n.4 (3d Cir. 2011)
(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252
(1986)) (bracketed material in original).  As already noted, we
"draw all reasonable inferences in favor of the nonmoving party,
and [we] may not make credibility determinations or weigh the
evidence." Eisenberry v. Shaw Bros., 421 F. App'x 240, 241 (3d
Cir. 2011) (quotation marks omitted).

### A.    Breach of Contract and WPCL Claims

Since Caple does not point to evidence from which a
factfinder could calculate damages to a reasonable certainty, her

12

breach of contract and WPCL claims do not survive summary judgment.

## 1.  <u>Standard</u>

Under Pennsylvania Law, a plaintiff advancing a breach of contract claim must establish "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" <u>Ware v. Rodale Press, Inc.</u>, 322 F.3d 218, 225 (3d Cir. 2003) (quoting <u>CoreStates Bank, N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  Our Court of Appeals's summary of Pennsylvania contract law explains that "[t]o prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a "'reasonable certainty.'" <u>Id.</u> at 225-26 (quoting <u>ATACS Corp. v. Trans World Communications, Inc.</u>, 155 F.3d 659, 668 (3d Cir. 1998).  Our Court of Appeals has cited the Pennsylvania Supreme Court's teaching that "[a]t a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." <u>Id.</u> at 226 (quoting <u>ATACS Corp.</u>, 155 F.3d at 669 (quoting <u>Spang & Co. v. United States Steel Corp.</u>, 545 A.2d 861, 866 (1988)).

13

In <u>Ware</u>, our Court of Appeals affirmed the district court's dismissal of a breach of contract claim because plaintiff "failed to present evidence from which a factfinder could determine damages with reasonable certainty." <u>Id.</u> Quoting the district court's reasoning at length, Judge Ambro's opinion for the Court found that the district court did not abuse its discretion in dismissing the breach of contract claim because the plaintiff's "deposition testimony reveal[ed] that his damages calculation was an incomplete (and hardly precise) estimate, not evidence upon which a factfinder could determine damages to a reasonable certainty." <u>Id.</u> & 223 n.3 (citing re-printed deposition testimony evidencing damages calculation premised on conjecture and assumptions). <u>Ware</u> reasoned that since the compensation calculations "required information on several factors . . . . [a] factfinder's ability to award ... a breach of contract required far more specific evidence than could be provided" by the proffered testimony. <u>Id.</u> at 226.

## 2. <u>Application</u>

Caple has failed to present sufficient evidence from which a factfinder could determine damages with reasonable certainty. Her complaint claimed that her bonus should have been

14

$10,194.00, Pl.'s Compl. ¶ 20, but her deposition testimony's calculation methodology belies the "reasonable certainty" of such a result.  Her calculation is wrought with assumptions about the constancy of her 2008 sales rankings.  Implicitly, her methodology also assumes the persistence of sales rankings for nearly 250 sales representatives nationally.  In testimony that she herself cites, Caple explains that in calculating 20<u>09</u> damages:

> I basically took my ranking of
> August and September of 20<u>08</u>, and
> at the time I was number one in my
> district, I was number 33 and
> number 29 in the country, and I
> measured it against our incentive
> compensation grid for the product.
>
>           * * *
>
> And then I went through, and as a
> projected ranking <u>if I would have
> continued to do as well as I had
> been doing</u>, and then added together
> -- added the different quarterly
> compensations.
>
>           * * *
>
> And, essentially, <u>if I would have
> continued to perform at that rate</u>,
> then I would have also been
> eligible for other awards[.]
>
>           * * *

> I [calculated my income by] us[ing]
> 35 [as my ranking], but at the time
> I was 33 and 29.  But I just gave
> myself a little bit of room and
> gave the company the benefit of the
> doubt.
> Q.   And so this calculation is
> based on your assumption that you
> would have been ranked 35 out of
> approximately 250 reps?
> A.   Yes.

Caple Dep. 267:21-270:1 (emphasis added).

Caple, like the plaintiff in Ware, has failed to provide any (1) "supporting documentation or expert reports or analysis to support [her] damages calculations[,]"(2) "evidence or documentation concerning costs and expenses [DSI] avoided by not having to perform [her] . . . duties under the contract," or (3) "basis for the" calculations such as the compensation grid upon which she herself relied.[7]  322 F.3d at 226.  After over ten

---

[7]   In fact, Caple testified that she kept this handwritten calculation and provided it to her attorney, but it was not produced here.  Caple Dep. 270:11-17.   We also note that Caple fails to cite any authority supporting the adequacy of her methodology or evidentiary showing.  Nor does she rebut the authority DSI cited in its argument about the inadequacy of her damages calculation.  Caple's response is notably lacking in legal citation.

months of discovery, Caple relies solely on her own opinion testimony.[8]

While "Pennsylvania law of contracts allows for some uncertainty in calculating damages," ATACS Corp., 155 F.3d at 670, "sufficient facts must be introduced so that the court can arrive at an intelligent estimate without conjecture." Delahanty v. First Pennsylvania Bank, N.A., 464 A.2d 1243, 1257 (1983). Here, a damages determination based on this evidence would result in double conjecture: a factfinder would be forced to speculate from Caple's suppositions about her and her peers' compensation and rankings.  Consequently, Caple's breach of contract claim

---

[8]   Caple contends that her calculation of damages is "unrebutted and should be permitted to be presented to the jury." Pl.'s Resp. Opp. M. Summ. J. 6.  She argues that DSI "did not furnish any other substantive calculation in response to" her interrogatory request: "What would Plaintiff's Incentive Compensation, quarterly and annual sales rankings, and other valuable incentive awards have been in 2009 had the sales data about which Plaintiff expressed concern relating to her assigned territory been accurate."   Id.  DSI, however, objected to the interrogatory on grounds that it was "vague, ambiguous, overbroad and unduly burdensome" and because it was  "argumentative and makes improper assumptions."  Def.'s Answers and Objections to Pl.'s Interrog. No. 2 at 4.  Caple never filed a motion to compel a response.  Furthermore, as the undisputed record makes clear, though DSI and ISM determined the data were "suspect", it never found that the data were "inaccurate."  IMS found the data passed all quality control measures.

does not survive summary judgment because a factfinder could not calculate damages to a reasonable certainty.[9]

And as Caple agrees, Pl.'s Resp. Opp. M. Summ. J. 5 n.3, her breach of contract claim's failure takes her WPCL claim down as well.  Thus, we will also grant summary judgment against her on that count of her complaint.  See De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003) ("WPCL does not create a right to compensation . . . . [r]ather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned damages." (alterations and internal quotation marks omitted)).

**B.   Section 1981 Claim**

As to Caple's § 1981 claim, she does not carry her burden at the third step of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973) where she must show that DSI's proffered nondiscriminatory reason for its decision was a pretext for race-based discrimination.  Given the complexity of the McDonnell Douglas analysis, we begin by rehearsing the parties' respective arguments on the remaining § 1981 claim.

---

[9]   We do not reach DSI or Caple's other breach of contract claim arguments.

1.   **Parties' Argument**

a.   **DSI's Motion for Summary Judgment**

In its motion for summary judgment, DSI argues that Caple's § 1981 claim must fail.  DSI contends that Caple's <u>prima facie</u> § 1981 showing is deficient.  Def.'s M. Summ. J. 21-24. Moreover, DSI argues that it has a legitimate non-discriminatory reason for its decision not to re-calculate Caple's compensation:

> In light of the minimal effect on
> compensation, and the fact that IMS
> had concluded that the data met its
> quality standards, the expense of
> re-running Incentive Compensation
> reports and rankings for all PC 1,
> PC 2, PC 3, and Cardiovascular
> Representatives in the company,
> supported the decision not to re-
> run Incentive Compensation.  <u>See</u>
> Koniaris Decl. at 23; Koniaris'
> Dep. at pgs. 29-30, lns. 11-5.

Def.'s Mem. Mot. Summ. J. 26.  DSI also contends that Caple has failed to carry her burden at stage three of <u>McDonnell Douglas</u> because she does not point to any evidence from which a factfinder could reasonably (1) <u>dis</u>believe her proffered nondiscriminatory reason, or (2) believe that an invidious discriminatory reason was more likely than not a motivating cause of the employer's action.

### b.   **Caple's Response**

Caple's complaint asserts a claim of disparate treatment race discrimination in violation of § 1981.[10]   She does this by citing DSI's "refusal to re-calculate [her] Incentive Compensation and field rankings" in connection with the data anomaly.  Pl.'s Compl. ¶¶ 18-20, 38.

Though Caple was on notice of DSI's arguments in support of its motion for summary judgment, she opposes its motion by paraphrasing (without citation to binding case law) the Third Circuit Model Jury Instructions for Race Discrimination Claims under 42 U.S.C. § 1981:

> Ms. Caple must prove that her race was a determinative factor in DSI's decision to refuse to rerun her sales ranking to account for the Exforge market share data for incentive compensation purposes like it did for white employee, [C.M.].

Pl.'s Resp. Opp. M. Summ. J. at 7.  In the alternative, she argues that she may establish her § 1981 claim by proving that "DSI <u>negligently discriminated</u> against her on account of her race in refusing to rerun her sales ranking to account for the Exforge

---

[10] Plaintiff's complaint implied that she was pursuing a § 1981 disparate treatment "pretext claim" under <u>McDonnell Douglas</u>.  Both parties have proceeded under this theory only.

market share data for incentive compensation purposes." Id.

(emphasis added). Caple relies on Judge Hart's opinion in King

v. Lehigh Univ., No. 06-4385, 2007 WL 211278, *1-*2 (E.D. Pa.

Jan. 23, 2007) for her "negligent discrimination" theory.

In addition, Caple does not directly rebut DSI's

argument regarding the sufficiency of her prima facie case

showing. Instead, she primarily attacks DSI's nondiscriminatory

reason under McDonnell Douglas step three.

### 2.   **Standard**

Plaintiff's disparate treatment race discrimination

claim is brought under 42 U.S.C. § 1981, which provides, in

pertinent part, that "[a]ll persons . . . shall have the same

right in every State and Territory to make and enforce

contracts." § 1981(a). "The term 'make and enforce contracts'

includes the making, performance, modification, and termination

of contracts, and the enjoyment of all benefits, privileges,

terms, and conditions of the contractual relationship." §

1981(b). Where there is no direct evidence of an employer's

race-based discrimination, § 1981 requires a showing of

discriminatory intent under the tripartite framework adopted in

McDonnell Douglas. See Patterson v. McLean Credit Union, 491

U.S. 164, 186 (1989) (superseded by statute on other grounds by 42 U.S.C. § 1981(b)).

Under the first step of this framework, plaintiff bears the "not onerous" burden of establishing a _prima_ _facie_ case of discrimination.  _Tex. Dep't of Cmty. Affairs v. Burdine_, 450 U.S. 248, 253 (1981).  Our Court of Appeals teaches that "[t]he goal at this stage is to eliminate[] the most common nondiscriminatory reasons for the defendant's actions; by doing so, the _prima_ _facie_ case creates an inference that the defendant's actions were discriminatory."  _Anderson_, 621 F.3d at 271 (alterations in original) (internal quotation marks omitted).  In _Makky v. Chertoff_, 541 F.3d 205, 214 (3d Cir. 2008), Judge Sloviter wrote for the panel that:

> In _Swierkiewicz v. Sorema N.A._, 534 U.S. 506, 510 ... (2002), the [Supreme] Court held that the _McDonnell Douglas_ _prima_ _facie_ case is an "evidentiary standard, not a pleading requirement."  In addition, the Court stated that . . . the requirements of a prima facie case may vary depending on the case.

Our Court of Appeals has since reaffirmed the elements of _McDonnell Douglas_'s _prima_ _facie_ case for employment discrimination in general terms.  We tailor them to our facts:

> (1) [Caple] is a member of a
> protected class; (2) [Caple] was
> qualified for the [re-calculation
> of her compensation and ranking
> that] [she] sought to attain . . .
> ; (3) [Caple] suffered an adverse
> employment action [because DSI did
> not do this re-run]; and (4) the
> action occurred under circumstances
> that could give rise to an
> inference of intentional
> discrimination.

Mieczkowski v. York City School Dist., 414 F. App'x 441, 444 (3d

Cir. 2011) (quoting Makky, 541 F.3d at 214); see McDonnell

Douglas, 411 U.S. at 802 n.13.[11]

The fourth prong requires additional exposition.  Our

Court of Appeals has recently explained that "[i]n the employment

context, . . . the fourth prong of the prima facie [§ 1981] case

---

[11] In Anderson v. Wachovia Mortg. Corp., 621 F.3d 261,
267 (3d Cir. 2010), our Court of Appeals yet again explained that
the "test" used in Title VII employment discrimination claims
also applies to employment discrimination claims brought under §
1981 "since 'the substantive elements of a[n employment
discrimination] claim under section 1981 are generally identical
to the elements of an employment discrimination claim under Title
VII.'"  Id. (quoting Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82
(3d Cir. 2009)); see Schurr v. Resorts Int'l Hotel, Inc., 196
F.3d 486, 499 (3d Cir. 1999).  This broad § 1981 employment
discrimination claim, enabled by Congress's 1991 amendment to the
Civil Rights Act, is distinct from the narrower (and arguably
more literal) § 1981 claim that has a more tangible contractual
nexus.  See, e.g. Kirt v. Fashion Bug # 3252, Inc., 495 F. Supp.
2d 957, 972 (N.D. Iowa 2007) (setting out prima facie elements in
§ 1981 contract interference claim).

may be established by satisfying the original fourth prong

articulated in McDonnell Douglas." Anderson, 621 F.3d 261, 273-

74 (3d Cir. 2010).  Anderson refashioned McDonnell Douglas's

original fourth prong in a manner useful for our consideration

here: has Caple "produc[ed] evidence of a 'causal nexus between

the harm suffered and [her] membership in a protected class, from

which a reasonable juror could infer, in light of common

experience, that [DSI] acted with discriminatory intent." Id.,

621 F.3d at 275.

          This is not, however, the end of the matter because "as

an alternative to the original fourth prong, [Caple has the

option of satisfying this prong] by showing that similarly

situated individuals outside the plaintiff's class were treated

more favorably." Id. at 273-74 (citing Matczak v. Frankford

Candy & Chocolate Co., 136 F.3d 933, 939 (3d Cir. 1997))

(footnote added)[12]; see C.A.R.S. Protection Plus, Inc., 527 F.3d

_____

          [12] DSI cites Sarullo v. U.S. Postal Service, 352 F.3d
789, 797-98 (3d Cir. 2003) (per curiam), to advance a fourth
prong that hybridizes the two alternative fourth prongs that our
Court of Appeals has recognized.  DSI's reliance on Sarullo is
misplaced.  Sarullo makes clear that it is not necessary to show
other similarly situated employees outside plaintiff's protected
class were more favorably treated under cognate circumstances.
Id. at 797-98 n.7.  In fact, Sarullo clarifies that our Court of
Appeals "require[s] only that the plaintiff show that the
                                        (continued...)

at 366 ("[t]he evidence most often used to establish this nexus [in the Title VII pregnancy discrimination context] is that of disparate treatment, whereby a plaintiff shows that she was treated less favorably than similarly situated employees who are not in plaintiff's protected class."). Regardless of what version of the fourth prong plaintiff uses, she "is entitled to [carry her burden by] rely[ing] on a 'broad array of evidence' in demonstrating a causal link between her protected status and her termination." See Dellapenna v. Tredyffrin/Easttown School Dist., No. 11-1394, 2011 WL 5110226, at *4 (3d Cir. Oct. 27, 2011) (not selected for publication) (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007)).

If a plaintiff-employee succeeds in establishing a prima facie case, the burden of production shifts to the defendant-employer to "articulate some legitimate, nondiscriminatory reason for" the adverse employment decision.

---

[12] (...continued)
employer continued to seek out individuals with similar qualifications after refusing to rehire the plaintiff under circumstances that raise an inference of unlawful discrimination." Id. Though plaintiff is afforded the opportunity to make its prima facie case on comparator evidence if it so chooses, it is by no means obliged so to do. As our citations make plain, Sarullo is by no means this principle's source.

McDonnell Douglas, 411 U.S. at 802. The defendant-employer satisfies its burden of production if it "introduc[es] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." Anderson, 621 F.3d at 277 (internal quotation marks omitted).  Upon the defendant-employer's meeting the second step's "relatively light burden," Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994), the burden rebounds to plaintiff.  In the third step, plaintiff-employee bears the burden of demonstrating that the employer's purported justification is but a pretext designed to mask discrimination.  This burden is more onerous than the first step because the factual inquiry rises to a new level of specificity. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 646 (3d Cir. 1998).

A plaintiff will not survive a motion for summary judgment on McDonnell Douglas's third step unless she "point[s] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [each of] the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); see Kautz v.

Met-Pro Corp., 412 F.3d 463, 467, 476 (3d Cir. 2005).

　　　　　To carry her burden of showing that a factfinder could

disbelieve the proffered reason, our Court of Appeals has

explained that:

>              [t]he plaintiff must adduce
>              evidence sufficient to "allow a
>              factfinder reasonably to infer that
>              each of the employer's proffered
>              nondiscriminatory reasons was
>              either a post hoc fabrication or
>              otherwise did not actually motivate
>              the employment action."  To do so,
>              the plaintiff must "demonstrate
>              such weaknesses, implausibilities,
>              inconsistencies, incoherencies, or
>              contradictions in the employer's
>              proffered legitimate reason for its
>              action that a reasonable factfinder
>              could rationally find them unworthy
>              of credence and hence infer that
>              the employer did not act for [the
>              asserted] non-discriminatory
>              reasons."  It is not sufficient to
>              show that the employer's decision
>              was wrong, mistaken, imprudent or
>              incompetently made.

DiCampli v. Korman Communities, 257 F. App'x 497, 500 (3d Cir.

2007) (emphasis added) (citations omitted); see Anderson, 621

F.3d at 277.

　　　　　Alternatively, to show that a factfinder could

reasonably believe that an "invidious discriminatory reason was

27

more likely than not a motivating or determinative cause of the

employer's action", <u>Fuentes</u>, 32 F.3d at 764, our Court of Appeals

has held that:

> a plaintiff can show, for example,
> that the defendant had previously
> subjected the same plaintiff to
> "unlawful discriminatory
> treatment,"[13] that it had "treated
> other, similarly situated persons
> not of his protected class more
> favorably," or that it had
> "discriminated against other
> members of his protected class or
> other protected categories of
> persons."[14]

<u>Anderson</u>, 621 F.3d at 277 (footnotes added) (quoting <u>Fuentes</u>, 32

F.3d at 764).  Such a showing must cross a prescribed threshold

---

[13] Caple makes no such allegation here.

[14] Caple does not point to facts under this prong --
though DSI pre-emptively does.  We agree with DSI that Caple's
deposition testimony on this issue would be insufficient to
establish pretext.  Our Court of Appeals has explained that
pretext cannot be established by showing "evidence" of race-based
discrimination in the hiring of other protected class members
without <u>also</u> showing those rejected candidates' otherwise
qualifying credentials and employment histories.  <u>See</u> <u>Haley v.
City of Plainfield</u>, 169 F. App'x 670, 674 (3d Cir. 2006).
Caple's deposition merely offers general, subjective <u>anecdotal</u>
evidence that is otherwise unsupported in the record.  She
labeled DSI a "white bread company" with few minority managers,
and she alleged that she heard of minority candidates applying
and getting rejected though she could only remember one such
person's first name.  Pl.'s Dep. 283:17-24, 286:18-287:12.  This
comparator evidence falls far short of establishing pretext at
the third step.

in order to survive summary judgment.  <u>Simpson</u>, 142 F.3d at 646, teaches that it is intolerable "to permit the inference of [disparate treatment] discrimination anytime [<u>sic</u>] a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably."

### 3.   <u>Application</u>[15]

---

[15] Before we reach the crux of the matter, we note Caple's misconstruction of Judge Hart's reasoning in <u>King</u>.  His Opinion there simply does not support her novel contention that "negligent discrimination" is as viable a claim as "intentional discrimination" under § 1981.

First, Caple brings this claim under § 1981.  Section 1981 creates an independent cause of action against private employers.  <u>Patterson</u>, 491 U.S. at 177-78; <u>see generally</u> Abigail Cooley Modjeska, <u>Employment Discrimination Law</u> § 10.7 at 10-30 (3d ed. current through 2011-2012 supplement) ("The Supreme Court has long interpreted § 1981 as creating an independent cause of action against private employers for racial discrimination.").  <u>King</u> construes plaintiff's "Title VII negligence claim" as asserting employer liability under <u>Title VII</u>.  Judge Hart noted that "[a]lthough perhaps more properly thought of as an alternative theory of liability under Title VII[,]" he reasoned that the theory was acceptable because the Supreme Court permitted employer liability in <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742, 758-59 (1998) (holding employer liable for sexual harassment in the Title VII context).  2007 WL 211278, at *1-*2.  Since <u>Patterson</u> has long guided our understanding of employer liability in § 1981 actions, <u>King</u> adds nothing to the legal standard applicable here.

Second, a § 1981 claim requires a showing of <u>intentional</u> discrimination.  Thus, it would be incoherent to
(continued...)

Viewing the facts in a light most favorable to Caple, her § 1981 claim cannot survive summary judgment.  In its motion for summary judgment and supporting exhibits, DSI has met its burden of showing that no genuine issue of material fact here exists.  Caple does not point to any evidence from which a factfinder could reasonably disbelieve DSI's articulated legitimate reason for not re-running incentive compensation and rankings.  In addition, she fails to cite any evidence that could lead a reasonable factfinder to believe that invidious discriminatory reasons were more likely than not the motivating or determinative cause of DSI's decision.[16]

---

[15] (...continued)
allow Caple's discrimination claim to succeed on a negligence showing.  Despite Caple's reliance on the Third Circuit Model Jury Instructions in her response, she notably overlooked the § 1981 Model Instruction's failure to use "negligence" (or any cognate of it) at any point -- and for good reason.

[16] Because we decide this case on other grounds, we do not reach DSI's arguments about the insufficiency of Caple's prima facie case.  Additionally, Caple does not argue that DSI failed to meet its burden at the second step.  There is no question, however, that DSI carried its burden here.  Each component of its proffered reason for not re-running Caple's incentive compensation and ranking is supported by undisputed evidence that, taken as true, could only permit the single conclusion that there was a non-discriminatory reason for DSI's decision.  See Anderson, 621 F.3d at 277.  Thus, we proceed to the third step of the McDonnell Douglas analysis.

### a.   A Factfinder Could Not Reasonably Disbelieve DSI's Nondiscriminatory Reason

DSI's motion for summary judgment asserts three nondiscriminatory reasons for its decision not to re-run incentive compensation and rankings:

> In light of [1] the minimal effect on compensation, and [2] the fact that IMS had concluded that the data met its quality standards, [3] the expense of re-running Incentive Compensation reports and rankings for all PC 1, PC 2, PC 3, and Cardiovascular Representatives in the company, supported the decision not to re-run Incentive Compensation.  See Koniaris Decl. at 23; Koniaris' Dep. at pgs. 29-30, lns. 11-5.

Def.'s Mem. Mot. Summ. J. 26.  Despite this plain statement in DSI's submission, Caple ignores DSI's proffered reasons and asserts a reason of her own creation: "DSI has asserted that it did not rerun Ms. Caple's sales ranking to account for the Exforge Data Anomaly because the [sic] IMS did not determine that the Exforge data was wrong."  Pl.'s Resp. Opp. M. Summ. J. 8. Caple then points to Smith's deposition testimony for the allegedly issue-creating material fact that "IMS and DSI knew the data was false or fake[.]"  Id.  From this premise, Caple

contends she "has adduced evidence on which a jury could disbelieve DSI's articulated reason." Id. (emphasis added).

In Fuentes, our Court of Appeals noted that "[i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder," 32 F.3d at 764 n.7 (emphasis added).  But even though DSI hands Caple a rather simple "bag" of nondiscriminatory reasons, Caple ignores them.

The record reflects that there is no material issue of fact as to whether (1) Koniaris's hypothetical analytics showed that a re-calculation of incentive compensation and rankings would have a "minimal effect," (2) IMS concluded that its data met its quality standards, and (3) Koniaris justified his decision not to re-calculate the incentive compensation and rankings because of a cost-benefit analysis.  In response, Caple directs us to consider Smith's hearsay deposition testimony that the "prescriptions . . . [were] termed by IMS to be flawed or fake or whatever you want to call it," Smith Dep. 14:22-24, as evidence of an inconsistency, implausibility, or contradiction in DSI's reason, thus rendering it unworthy of credence in the eyes

of a reasonable factfinder.  This argument will not withstand scrutiny.[17]

Whether the Exforge prescription data were "flawed or fake" or "suspect" does not change the uncontested fact that the IMS data passed quality control standards such that IMS did not recalculate the data.  This distinction matters.  The undisputed record shows that the <u>cumulative</u> IMS data upon which DSI relied were never determined to be "fake" or "flawed".  Caple's focus on the Exforge data's suspect nature is thus a red herring.  DSI does not claim to rely on the IMS data because it was flawless.  DSI only claims it relied on the IMS data because it passed <u>IMS</u>'s quality control standards.  Furthermore, under the Bonus Plans DSI was obliged to use these data to calculate incentive compensation and rankings.  DSI therefore had a contractual duty under its Bonus Plans to use IMS data in these calculations.  Def.'s Reply 6.

---

[17] DSI argues that Smith's excerpted statement is taken out of context.  Def.'s Reply 4.  DSI has a point here.  The deposition transcript reveals that a few moments after the statement reprinted above, Smith clarified his diction choice: "I guess the flaw or fake, I guess that was probably just my terminology.  But I never remember hearing . . . that IMS said that the[ data] were fake."  Smith Dep. 19:13-15.  Though we find the context of Smith's statement to undermine Caple's argument, we need not rely on this reality in reaching our decision.

Thus, DSI's reliance on IMS's data does not show an implausibility, inconsistency, incoherency, or contradiction in DSI's proffered nondiscriminatory reason.  Sample data may here or there be "fake or flawed" or "suspect" but still, as here, pass quality control standards.  At worst, DSI may have imprudently decided to carry on with compensation calculations using data that were based in part on "suspect" Exforge sampling that nevertheless passed a major third-party company's quality control protocol.[18]  Our Court of Appeals requires more than such imprudence to establish pretext at step three.  See DiCampli, 257 F. App'x at 500.

Additionally, Caple does not challenge DSI's reasoning that re-calculation would have had a minimal effect on employee incentive compensation or ranking.  She also does not challenge DSI's cost-benefit rationale.  The undisputed record thus demonstrates that DSI's incentive compensation and ranking scheme precluded re-running a single sales rep's incentive compensation or ranking.  Koniaris's deposition testimony establishes that a change in one employee's rank necessarily changes the rankings of

---

[18] We use imprudent only because with 20-20 hindsight the five to ten thousand dollars DSI saved in not re-running Caple's and all of its other employees' compensation and rankings has easily been spent on attorneys' fees in this lawsuit.

34

employees above and below her.  With (1) so many employees possibly changing places, (2) the hypothetical analysis showing only a $0 to $26 marginal pay increase for the sample group, and (3) a paucity of race-based decisionmaking, a factfinder could not reasonably find that DSI's proffered rationale was a <u>post hoc</u> pretext.

        **b.**    **A Factfinder Could Not Reasonably <u>Believe</u> an Invidious Discriminatory Reason Was More Likely than Not a Motivating <u>or Determinative Cause of DSI's Action</u>**

In addition to pointing to the "fake or flawed" data discussed above, Caple also cites Koniaris's testimony for the undisputed fact that "he was directed by Mr. Smith to rerun the ranking for a white employee, [C.M.], but not Ms. Caple who is black to account for the false data."  Pl.'s Resp. Opp. M. Summ. J. 8.  She asserts that these two facts together are enough for a jury to "reasonably infer that that decision was based on Ms. Caple's race."  <u>Id.</u>[19]

---

[19]    DSI's recitation of facts identifies moments in Caple's deposition testimony where she discussed alleged racial comments by Pagana (or possibly other unidentified individuals). In its motion for summary judgment, DSI pre-emptively contended that these facts are inadequate to support an inference of discrimination under our Court of Appeals's jurisprudence. Def.'s Mem. M. Summ. J. 12-13, 27-33.  Notably, Caple's response
(continued...)

Under our Court of Appeals's jurisprudence, this is not sufficient evidence of pretext to survive summary judgment. Simpson holds that it is intolerable "to permit the inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably." 142 F.3d at 646; see also Nichols v. Bennett Detective & Protective Agency, Inc., 245 F. App'x 224, 230-31 (3d Cir. 2007).  This is precisely what Caple tries to do here when she points to one white person DSI may have treated more favorably than she when it included one white employee in a hypothetical analysis of the

_____

[19] (...continued)
ignores these alleged race-based comments.  Since Caple does not point to these facts to counter DSI's proffered nondiscriminatory reason, they do not factor into our analysis at step three. Nevertheless, we agree with DSI that such statements were "stray remarks" that our Court of Appeals has held are insufficient to establish pretext.  Pagana's alleged early 2010 racial comments about her hair, a hiring quota, or a one-way trip to Haiti lack any temporal or substantive connection to Koniaris's independently-arrived-at cost-benefit decision not to re-run Caple's incentive compensation or ranking in October 2009.  See Parker v. Verizon Pennsylvania, Inc., 309 F. App'x 551, 558-59 (3d Cir. 2009) (holding "stray remarks" unavailing in summary judgment pretext analysis where comments were made seven months removed from adverse employment decision and not directly related to a decision ultimately rendered by group including other non-remarking individuals).

data anomaly's impact on employee incentive compensation and ranking.  The undisputed record shows that DSI did not re-calculate compensation or rankings for <u>anyone</u> in its workforce.  From these facts, a factfinder could not reasonably conclude that an invidious discriminatory reason was more likely than not a motivating or determinative cause of DSI's action.

In addition, Smith's "fake or flawed" comment adds nothing to the mix.  It is race neutral.  As mentioned before, DSI's decision to rely on these data was, with hindsight, imprudent at worst.  It cannot be construed to suggest any invidious discriminatory motivation.  Thus, a reasonable factfinder could not find it more likely than not that Caple's race was a motivating factor in DSI's decision not to re-run her (or anyone else's) incentive compensation or ranking.[20]

---

[20] Though we decide this case on the grounds cited above, two other issues undermine the viability of Caple's claim.  First, there is no evidence that Caple and C.M. are "similarly situated."  <u>See, e.g.</u>, <u>Wilcher v. Postmaster General, No. 10-3075</u>, 2011 WL 3468322, *2-*3 (3d Cir. Aug. 9, 2011) (finding failure to satisfy "similarly situated" status at pretext stage); <u>Opsatnik v. Norfolk Southern Corp.</u>, 335 F. App'x 220, 222-23 (3d Cir. 2009) (same).  Second, Caple has also not pointed us to any case law to suggest that it is "favorable treatment" when one non-protected-class employee (instead of one protected-class employee) is included in a hypothetical analysis -- let alone a hypothetical analysis from which a company makes a business decision that is then applied equally to all employees.

BY THE COURT:

__\s\Stewart Dalzell